IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEVIN M. CALLAHAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 20 C 2852 |
| ) | |
| H.E. WISDOM & SONS, INC. (d/b/a ) | |
| WISDOM ADHESIVES WORLDWIDE) ) | |
| (n/k/a DUB CAPITAL, INC.), ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Kevin Callahan has asserted two quasi-contract claims against H.D. Wisdom & Sons, Inc. (Wisdom Adhesives) based on his role in growing the company's global business prior to its acquisition. Wisdom Adhesives has moved for summary judgment. For the reasons stated below, the Court grants the motion.

### Background

Jeffrey Wisdom, head of Wisdom Adhesives, sold his company to H.B. Fuller for $122 million in 2017. This lawsuit focuses on a $5 million segment of that sale. The following facts are undisputed except where otherwise noted.

In 2013, Wisdom hired Callahan as a consultant to "grow the [c]ompany's non-North America global business." Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 37. The two had grown up as close friends, each serving as the best man in the other's wedding, and they had previously worked together on creating a book about the company's

history. The parties entered into a verbal agreement under which Wisdom Adhesives paid Callahan $20,000 per month for his consulting services, though that fee ranged down to $15,000 and $10,000 over the years. The parties dispute the precise responsibilities that Callahan was to provide, but at a broad level, he was responsible for Wisdom Adhesives' international sales. Callahan assumed the title of vice chairman, and in his first year on the job, he increased global revenues from $700,000 to $1.9 million.

Because of this growth, Callahan wanted a greater upside. He began discussing a potential ownership stake in the business in November 2014. The parties dispute whether Callahan was ever granted an ownership stake. Callahan maintains that in these 2014 discussions, Wisdom told him that he "view[ed] the global business to be [Callahan's] business." Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. A at 202. Wisdom Adhesives disagrees and emphasizes the lack of any documentation formalizing a transfer of ownership. To this point, later in August 2016, Callahan wrote an email again requesting a compensation plan "based on a percentage of revenue rather than a flat monthly consulting fee." Def.'s Stat. of Material Facts, Ex. 9 at KC037828–29. Wisdom did not agree to this request. Instead, the company adjusted Callahan's compensation to $15,000 per month to approximate a percentage of global revenues at the time.

In the wake of the November 2014 discussions when he first proposed an ownership stake, Callahan increasingly focused his efforts on pursuing foreign joint ventures that would ultimately grow the business. The parties dispute the impetus behind these efforts. Callahan characterizes establishing joint ventures as wholly

2

separate from his original responsibility of global sales and maintains it was an entirely new pursuit deriving from the 2014 compensation discussions.  Wisdom Adhesives contends that the 2013 verbal agreement already contemplated foreign joint ventures, thereby disconnecting this line of work from any potential ownership stake.  Origins aside, Callahan nearly finalized at least two joint ventures, one of which got as far as a memorandum of understanding between Wisdom Adhesives and the other company.  Jeffrey Wisdom, however, retained final approval and ultimately never signed off on either deal.

      Following the sale of Wisdom Adhesives to H.B. Fuller, Callahan repeatedly requested that he be compensated for his contributions to the $122 million acquisition price.  Because this price reflected a multiple of the company's profits and the global business revenue had grown to $4.2 million in 2016, Callahan believed Wisdom Adhesives owed him $5 million.  The company never agreed to these requests.

      Callahan filed suit in the District of Connecticut, and the case was later transferred to this district.  In his complaint, Callahan alleged that the 2014 compensation discussions had resulted in a second oral agreement under which he received an ownership interest.  This Court dismissed Callahan's breach of contract and promissory estoppel claims because the alleged second oral agreement was not "sufficiently definite" to serve as the basis for these claims.  Order of July 26, 2020 at 5.  Callahan filed a second amended complaint and asserted claims of quantum meruit and unjust enrichment stemming from Wisdom Adhesives not compensating him for "his work efforts. . . securing the proposed joint ventures and growing the global business."  Second Am. Comp. ¶¶ 100, 116.  Wisdom has moved for summary judgment.

**Discussion**

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the evidence and draws all inferences in favor of the nonmoving party. *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). The plaintiffs must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes*, 914 F.3d at 564.

**A.   Applicable Law**

A quasi-contract, or contract implied in law, is a duty imposed to prevent injustice when there is no actual agreement between the parties. *Marcatante v. City of Chicago*, 657 F.3d 433, 442 (7th Cir. 2011). Both quantum meruit and unjust enrichment serve as quasi-contract remedies. Though these types of claims are analytically similar, Illinois law distinguishes them on the basis of damages: "In a quantum meruit action, the measure of recovery is the reasonable value of work and material provided, whereas in an unjust enrichment action, the inquiry focuses on the benefit received and retained as a result of the improvement provided." *Hayes Mech., Inc. v. First Indus.,*

*L.P.*, 351 Ill. App. 3d 1, 9, 812 N.E.2d 419, 426 (2004).

Illinois law, however, bars recovery on a claim of quasi-contract when a real contract, whether express or implied, concerns the same benefit upon which the plaintiff bases her claims. *Marcatante*, 657 F.3d at 443. Illinois courts look to the subject matter of the contract, rather than the contract's specific terms or any provisions related to the claim, and they interpret the contract's subject matter broadly. *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 689 (7th Cir. 2004). A party can maintain a quasi-contract claim "when the work that the plaintiff performed was wholly beyond the subject matter of the [existing] contract." *Archon Constr. Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 39, 78 N.E.3d 1067, 1076.

Illinois courts point to *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App. 3d 357, 432 N.E.2d 999 (1982), as a paradigmatic case where an express contract barred quasi-contract recovery. *See, e.g.*, *Archon Constr.*, 2017 IL App (1st) 153409, ¶ 42, 78 N.E.3d at 1076; *Hayes Mech.*, 351 Ill. App. 3d at 12, 812 N.E.2d at 429. In *Industrial Lift*, the parties had an agreement under which the plaintiff bought the defendant's Japanese forklifts and sold them to American customers. After the defendant notified the plaintiff that it was terminating the agreement, the plaintiff sought quasi-contract relief for design changes it had implemented to better sell the forklifts to the American market. Although "the contract did not expressly cover the design changes," the court construed its general subject matter as "the sale and servicing of defendant's products." *Indus. Lift*, 104 Ill. App. 3d at 361, 432 N.E.2d at 1002. The court accordingly barred the plaintiff's claims, explaining that "[p]arties to a contract often perform services not expressly demanded by the contract." *Id.*

5

**B.     Analysis**

Callahan premises his quasi-contract claims on "his work efforts. . . securing the proposed joint ventures and growing the global business." Second Am. Comp. ¶¶ 100, 116. He argues these efforts fall outside the scope of his employment agreement with Wisdom Adhesives. If so, the express contract would not bar quasi-contract relief.

Callahan's contention lacks merit. First of all, Wisdom, who indisputably held approval authority over proposed joint ventures, did not sign off on either of Callahan's proposals. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶¶ 47, 50. Because the joint ventures did not move forward, there was no "enrichment" of Wisdom Adhesives at all, let alone unjust enrichment, and no basis upon which to assign a value to Callahan's ultimately unsuccessful work. Thus despite Callahan's attempt to base his compensation on the sale price of Wisdom Adhesives, his joint venture efforts never generated income or opportunities for income that contributed to that price, which was based on a multiple of the company's profits.

Perhaps for this reason, the thrust of Callahan's claim, as discussed in his response to the motion for summary judgment, is that the global business he grew contributed to Wisdom Adhesives' value leading up to the company's sale. Specifically, Callahan calculates his damages by estimating "the portion of the [$122 million] purchase price . . . attributable to the global business." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14.

This, however, does not save Callahan's claims. He acknowledges that his original agreement with Wisdom entailed "doing whatever it [took] to make global sales for the company." Def.'s Stat. of Material Facts, Ex. 2 at 164. Quasi-contract relief

6

provides for recovery of "services nongratuitously rendered. . . where no contract exists to dictate payment." *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979, 931 N.E.2d 810, 826 (2010). When Callahan attempts to base his recovery on the claimed increase in global sales that he helped accomplish, he runs headlong into this legal principle. Specifically, there *was* a contract that dictated payment: the parties' 2013 express agreement, under which Callahan was paid for consulting services related to global sales. Thus considered this way, Callahan was paid for his work, just as the parties contracted. Quasi-contract recovery is therefore barred.

  Finally, Callahan contends that the parties' 2014 compensation discussions should salvage his claims. He says he has sufficiently asserted that Wisdom "granted him an ownership interest in the global business." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 13. His argument is that this promise should change the calculus. The Court, however, previously dismissed Callahan's claim based on a theory of express contract, and he cannot appropriately revive that claim via his response to a summary judgment motion. *See Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 412 (7th Cir. 2009) *Messner v. Calderone*, 407 F. App'x 972, 974 (7th Cir. 2011) ("A plaintiff cannot add additional claims through arguments made in opposing summary judgment . . . ."). That aside, growing the global business was exactly what the parties' express contract called for Callahan to do. Just as Wisdom could not reclaim Callahan's monthly fee if he was unsuccessful in growing global sales, Callahan cannot demand more than the fee he bargained for because his efforts (for which he was paid) may have helped Wisdom sell the company for a higher price.

## Conclusion

The Court grants defendant's motion for summary judgment [dkt. no. 133] and directs the Clerk to enter judgment in favor of defendant and against plaintiff.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 5, 2021